CEILING & INTERIOR SYSTEMS
SUPPLY, INC., a Washington
Corporation, Plaintiff,

v.

USG INTERIORS, INC., a Foreign
Corporation, Defendant.

No. 91–1588D.

United States District Court,
W.D. Washington,
at Seattle.

April 28, 1993.

Order Declining to Vacate
Decision on Reconsideration
June 11, 1993.

David Leiberworth, Scott G. Warner, Baron Lieberworth & Warner, Harold G. Weinberg, Weinberg & Siegel, Seattle, WA, for plaintiff.

Donald G. Kempf, Jr., Walter R. Lancaster, Jeffrey Cashdan, Kirkland & Ellis, Chicago, IL, Howard (Terry) Hall, George, Hull, Porter & Kohli, Seattle, WA, for defendant.

## ORDER

DIMMICK, Chief Judge.

This cause of action was brought under both the court's diversity and federal question (antitrust) jurisdiction. With this motion, defendant USG Interiors, Inc. ("USGI") seeks summary judgment dismissal of all of plaintiff's claims except the one for tortious interference. After full consideration of the briefs and affidavits filed by counsel, the Court dismisses all the antitrust claims, but

retains part of plaintiff's breach of contract and its tortious interference claims.[1]

## FACTS

Ceiling and Interior Systems Supply, Inc. ("CISSI") is a distributor of acoustical products in the Northwest. At issue here are two of those products: "Board," an acoustical tile used on ceilings; and "grid," a metal suspension system for holding the board. CISSI sells in a five-state area (Alaska, Washington, Oregon, Idaho and Montana) which it refers to as the "Northwest market."

CISSI was incorporated in 1970 and had been an authorized distributor of board manufactured by Conwed Corporation and grid manufactured by Donn Corporation prior to the time USGI or one of its affiliates acquired Conwed in 1985 and Donn in 1986. Written agreements existed between CISSI and Conwed, and CISSI and Donn, at the time USGI took over the board and grid firms. (These agreements will be discussed in greater detail under the motion to dismiss the breach of contract claim.) In a letter dated November 18, 1986, USGI stated its policy towards its distributor (also arguably a contract). During the relevant period, CISSI also carried competing lines of grid and board.

In May 1991, CISSI's Portland distributor became an Armstrong distributor. The CISSI distributor in Seattle also became an Armstrong distributor in October 1991. USGI argues that these two CISSI distributors became exclusive distributors for Armstrong board. CISSI disputes the exclusivity. In any event, the Armstrong deal appears to have precipitated an offer of an exclusive dealership from USGI requiring CISSI to abandon Armstrong. USGI canceled its dealerships with Portland and Seattle CISSI after CISSI declined the exclusive dealership. USGI's distributorship with CISSI in Boise and Spokane continued. The question for the Court is whether USGI's actions breached the contract with CISSI and/or violated antitrust laws.

CISSI claims follow:

1. Breach of contract.

2. Wrongful interference with economic relationships.

3. Attempted monopolization under Sherman Act § 2 and RCW 19.86.040.

4. Termination for refusal to accede to exclusionary arrangement in violation of RCW 19.86.030 & .050, and RCW 19.86.090.

5. Termination for refusal to accede to tying arrangement in violation of RCW 19.86.030 and RCW 19.86.090.

Earlier this Court dismissed the claim for breach of duty of good faith and fair dealing, and plaintiff has abandoned claims brought under the Washington Consumer Protection Act and Washington Franchise Investment Act.

■ Plaintiff mistakenly relies on this Court's Order of March 13, 1992, denying defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The Court uses a different standard in addressing a motion pursuant to Fed.R.Civ.P. 56. Even though summary judgment is disfavored in complex antitrust litigation, it is not precluded. *Betaseed, Inc. v. U & I Inc.*, 681 F.2d 1203, 1207 (9th Cir.1982). When plaintiff bears the burden of proving an element of his case at trial, defendant will prevail on a motion for summary judgment if plaintiff does not come forward with evidence of that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Moreover, plaintiff's evidence must establish that there is a genuine issue of material fact, not "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

## DISCUSSION

### 1. *Breach of Contract*

Defendant USGI is successor to Conwed (board producer) and Donn (grid producer).

---

1. Defendant USGI requested oral argument, but plaintiff CISSI indicated that it was unnecessary. The Court agrees in view of the extensive briefing and the excellent presentation of evidence by both parties.

Defendant does not argue at this point the contractual validity of the following agreements: Conwed and CISSI agreement, dated July 28, 1978; and Donn and CISSI agreement undated, but apparently sent in 1983. In addition, USGI sent a letter to CISSI dated November 18, 1986 explaining the basis for its continuing distributorship with CISSI. None of these documents set a specific date on which the distributorship would cease.

Plaintiff CISSI insists that the agreements constitute an ongoing commitment with termination to occur only for cause. USGI counters that the distributorship could be canceled at will with 90 days notice which it gave. USGI terminated CISSI as a distributor of its board and grid at CISSI's Seattle and Portland outlets, effective October 18, 1991. The other CISSI outlets continued to sell USGI board and grid.

There are two aspects to the breach of contract issue. The first relates to events occurring more than three years prior to USGI's termination of the contract; the second relates to the termination itself. USGI asserts different defenses to each aspect.

As to the first, CISSI alleges that USGI set up competing distributorships contrary to the written agreements with CISSI: Rose City in Portland in 1987 and Northwest Acoustical Supply in Seattle in July 1988. Additionally, USGI sold directly to customers during that period. All of this was allegedly in breach of the agreements between USGI and CISSI. USGI's defenses to these alleged breaches are (1) the claim is barred by the three-year statute of limitations governing unwritten contracts and (2) CISSI has waived its claims by failing to act.

■ In arguing that the three-year statute of limitations applies, USGI points out that the contract in question is part oral and part written, thus the three-year statute (rather than the six-year statute for written contracts) applies. *See Cahn v. Foster & Marshall, Inc.,* 33 Wash.App. 838, 658 P.2d 42 (1983) ("if resort to parol evidence is necessary to establish any material element, then the contract is partly oral...."). There are no written words defining the length of contract in any of the documents. As will be discussed later, the Court would have to look outside the document were it to reach plaintiff's position that the distributorship could be terminated only for cause. It would therefore appear that *Cahn* requires application of a three-year statute and CISSI's claims which predate filing by three or more years are foreclosed.

■ Because the Court concludes that the three-year limitation period applies, it is not necessary to reach the waiver issue. Nonetheless, the Court concludes that USGI has not proved waiver. It is clear that CISSI knew of the competing distributorship but voiced an objection, and had not unequivocally relinquished its rights.

> Waiver is the intentional relinquishment of a known right. It is necessary that the person against whom waiver is claimed have intended to relinquish the right, advantage, or benefit and his action must be inconsistent with any other intent than to waive it.

*Wagner v. Wagner,* 95 Wash.2d 94, 102, 621 P.2d 1279 (1980), cited in *Central Washington Bank v. Mendelson–Zeller,* 113 Wash.2d 346, 353, 779 P.2d 697 (1989).

Next is the second aspect: Was either contract terminable at will or only for cause; and because for more than one year, was it outside the statute of frauds? USGI insists that the contracts in question (earlier Conwed and Donn agreements and USGI letter) are terminable at will, relying on *Birkenwald Distributing Co. v. Heublein, Inc.,* 55 Wash. App. 1, 776 P.2d 721 (1989). The *Birkenwald* case does support USGI's argument with the following language:

> Parties contracting in good faith for a continuing performance presumably *intend* a reasonable time if they do not discuss duration; for this reason, either party may terminate its obligations after a reasonable time has passed.

*Birkenwald,* 55 Wash.App. at 7, 776 P.2d 721 (citations omitted). In *Birkenwald,* however, the contract at issue was an oral contract. Moreover, *Birkenwald* preceded the Washington Supreme Court's discussion on inter-

preting contracts in *Berg v. Hudesman,* 115 Wash.2d 657, 801 P.2d 222 (1990).

■ In analyzing a contract, the *Berg* court differentiated between contract interpretation and contract construction. "Interpretation" refers to ascertaining the meaning and intent of the parties in the context of the whole agreement, and may be gleaned from circumstances leading up to the formation and the conduct of the parties before and after formation. "Construction" refers to determining the legal effect of a contract. *Id.* 115 Wash.2d at 663–69, 801 P.2d 222.

■ Application of the statute of frauds (RCW 19.36.010) in the midst of this argument is problematic. The statute of frauds defense is premised on the requirement in Washington that contracts which require more than one year to perform must be in writing. The contracts at issue here are in writing, but the specific time for their performance is not clearly written.

This Court concludes that pursuant to *Berg,* the written contracts at issue here are subject to extrinsic evidence to explain the meaning and intent of the parties as to termination. The fact that these written contracts do not contain a written date or grounds for termination, however, will not defeat them under the statute of frauds. The Court thus denies summary judgment on the issue of contract termination.

2. *Attempted Monopolization in Violation of Section 2 of the Sherman Antitrust Act*

Section 2 of the Sherman Act (15 U.S.C. § 2), criminalizes conduct which creates a monopoly or attempts to monopolize interstate or foreign commerce. Private parties are also given the right to bring civil actions for treble damages. 15 U.S.C. § 15.[2]

■ CISSI bases its claims of attempted monopolization on the following: (1) USGI's

termination of CISSI as both a board and grid distributor because of CISSI's refusal to give up Armstrong and push USGI exclusively; (2) USGI's threats to price CISSI out of the market; (3) USGI's attempt to leverage its dominant position in grid to improve its position in board sales.[3]

USGI admits to terminating CISSI as a distributor in Portland and Seattle after CISSI declined USGI's offer of an exclusive distributorship in Seattle and one of two distributorships in Portland (agreeing to close one of its company-owned outlets). These actions, according to USGI, were motivated by CISSI's decreasing sales of USGI products.

There are three primary manufacturers of board in the Untied States: Armstrong (the largest manufacturer of acoustical ceiling products), USGI, and Celotex. There are also three primary manufacturers of grid in the United States: USGI (the largest), National Rolling Mills, and Chicago Metallic Corporation. USGI admits to being the largest national seller of grid, and being second to Armstrong in board sales. USGI holds a patent on its grid design.

■ To prove an attempted monopolization, plaintiff must demonstrate (1) specific intent to control prices and destroy competition; (2) predatory or anti-competitive conduct; (3) a dangerous probability of success; (4) causal antitrust injury. *Pacific Express, Inc. v. United Airlines, Inc.,* 959 F.2d 814, 817 (9th Cir.1992) *cert. denied* — U.S. —, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992). Under a very recent Supreme Court holding, proof of section 2 attempt to monopolize requires "dangerous probability that they would monopolize a particular market and specific intent to monopolize." *Spectrum Sports, Inc. v. McQuillan,* — U.S. —, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Recognizing the distinction between actions of a single firm and concerted activity, the Court reversed the Ninth Circuit and the trial court,

---

**2.** Plaintiff's claim also asserts violation of RCW 19.86.040, which essentially follows section 2 of the Sherman Act. The parties rely almost exclusively on federal cases.

**3.** Leveraging (use of market power in one market to gain advantage in another market) may violate

antitrust law. *Key Enterprises of Delaware, Inc. v. Venice Hospital.,* 919 F.2d 1550 (11th Cir. 1990), *vacated,* 979 F.2d 806 (11th Cir.1992); *but see Catlin v. Washington Energy Co.,* 791 F.2d 1343, 1346 (9th Cir.1986) (reserving judgment on the issue of monopoly leveraging as separate antitrust claim).

noting that "section 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so." *Id.* at ——, 113 S.Ct. at 892 (citation omitted). The Supreme Court thus held as follows:

We hold that petitioners may not be liable for attempted monopolization under section two of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize. In this case, the trial instructions allowed the jury to infer specific intent and dangerous probability of success from the defendants' predatory conduct, without any proof of the relevant market or of a realistic probability that the defendants could achieve monopoly power in that market. In this respect the instructions misconstrued section two, as did the court of appeals in affirming the judgment of the district court.

■ CISSI argues that *Spectrum Sports* is a narrow holding and does not require market share analysis to prove dangerous probability. CISSI does not say how else it would be proved, and the Supreme Court pointedly overruled the Ninth Circuit's position that evidence of unfair or predatory conduct obviated the need for market-analysis. This Court's reading of *Spectrum Sports* and its specific reversal of Ninth Circuit precedence means that CISSI cannot prove that USGI (a single firm) attempted to monopolize without defining the relevant market and offering evidence of the dangerous probability that USGI could achieve a monopoly in that market. CISSI has not done so.

■ CISSI implies that the relevant product is board, but offers no analysis of alternative products and the elasticity of price and demand. USGI's evidence indicates that even in grid market (where it admits a dominant position) its price increases are considerably less than the inflation rate for 1989–1992. *See* Watkins Affidavit. CISSI's former president, Don Hagarty, acknowledged that grid is priced competitively and that customers respond to price fluctuation. There is clear evidence that Armstrong is the leading seller of board and no evidence

that USGI could overtake Armstrong and achieve a monopoly in board.

Similarly, CISSI has not even attempted to define the relevant geographic market. At various points in its brief, CISSI refers to evidence of a northwest market, a national market, an Alaska market, an Oregon and Eastern Washington market, and a Western Washington market. However, it offers no clear figures to demonstrate market shares for USGI board and grid in a particular geographic market. CISSI refers to a multitude of figures (some based on USGI's internal forecasts) but nowhere settles down to identify the geographic market it accuses USGI of attempting to monopolize.

Because of CISSI failure to define the relevant market which it accuses USGI of attempting to monopolize, and its consequent failure to show dangerous probability that USGI would monopolize, CISSI's section 2 claim is dismissed.

3. *Plaintiff's Claim of an Attempt to Create an Exclusionary Arrangement in Violation of RCW 19.86.030 & .050 and RCW 19.86.090*

CISSI contends that USGI's offer of an exclusive distributorship (which was refused by CISSI) was in violation of Washington's antitrust statutes, because it was an attempt to create an exclusionary arrangement. USGI describes the offer as one for a vertical nonprice restraint, which would be examined under antitrust law as to whether it was an unreasonable restraint on trade ("the rule of reason").

The Washington statute, RCW 19.86.090, permits an action by anyone who is injured in his business or property "because he or she refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of [other antitrust statutes as explained next] ..." The two statutes plaintiff invokes at this point are RCW 19.86.030, prohibiting conspiracies in restraint of trade and RCW 19.86.050, which makes it unlawful to agree not to use or deal in commodities "where the effect of such ... may be to substantially lesson competition or tend to create a monopoly in any line of commerce."

CISSI argues that this prohibition parallels federal law proscribing exclusive dealing which is anti-competitive.[4]

 Thus this Court looks at exclusive dealing under the "rule of reason," as would a federal court. *Ballo,* 39 Wash.App. at 26, 692 P.2d 182. Exclusive dealing is not per se illegal. Rather, under the rule of reason, this Court must consider all the circumstances of the case to determine if the exclusive arrangement imposes an unreasonable restraint of trade. *See, e.g., Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). One expert described the factors to be considered thusly:

> Relevant circumstances can include such diverse factors as the defendants' intent and purpose in adopting the restriction; the structure of and competitive conditions within the affected industries; the relative competitive positions of the defendants; the presence of economic barriers inhibiting the ability of competitors to respond and offset the challenged practices; and apparent justifications for the restriction such as enhanced efficiency, protection of product or service goodwill, and inducing dealer loyalty. No single such factor is decisive.

W. Holmes, *1992 Antitrust Law Handbook* § 1.04, at 163–64. The *Holmes* treatise goes on to point out that a rule of reason inquiry necessarily begins with identification of the relevant market.

This takes the Court full circle back to the section 2 analysis "attempt to monopolize" above and the need for market analysis. This conclusion is supported by *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In addressing an exclusive contract by a hospital for the services of certain anesthesi-ologists, the Supreme Court again emphasized the need for market analysis to determine the anticompetitive effects. "There is, however, insufficient evidence in this record to provide a basis for finding that the Roux contract, as it actually operates in the market, has unreasonably restrained competition." *Id.* at 29, 104 S.Ct. at 1567.[5]

Similarly, in *Barr Laboratories, Inc. v. Abbott Laboratories,* 978 F.2d 98 (3d Cir. 1992), the court examined an exclusive dealing arrangement in the pharmaceutical field using section 3 of the Clayton Act (15 U.S.C. § 14) and section 1 of the Sherman Act (15 U.S.C. § 1). In *Barr,* the relevant market had been defined in the first half of a bifurcated trial, after which the trial court entered summary judgment for defendant. The Court of Appeals affirmed the trial court's conclusion that the exclusive dealing contracts "did not portend an immediate or future anti-competitive backlash." *Id.* at 111.

 The Court simply does not have here the basic information for determining that USGI's offer of an exclusive contract (had it been accepted) would have unreasonably restrained competition. This claim is therefore dismissed.

### 4. Plaintiff's Claim of an Attempt to Impose an Illegal Tying Arrangement in Violation of RCW 19.86.030 and RCW 19.86.090

CISSI contends that the agreement offered by USGI (Seattle and Portland exclusive and semi-exclusive dealerships) if consummated would have constituted an illegal tying arrangement. Here again the Court is directed to RCW 19.86.090 governing refusals "to accede to a proposal for an arrangement which, if consummated, would be in violation of ..." In this instance, CISSI points to RCW 19.86.030, which states as

---

4. Washington law recognizes that this statute is patterned after the Sherman Antitrust Act, and that the Legislature "anticipated our courts would be guided by the interpretation given by the federal courts to the corresponding federal statutes. RCW 19.86.920." *Ballo v. James S. Black Co.,* 39 Wash.App. 21, 692 P.2d 182 (1984).

5. In *Jefferson Parish,* the Court's analysis was premised on section 1 of the Sherman Act. It is

well to remember that in the instant case, the Court is examining an *attempted* exclusive dealing as it relates to Washington law. In doing so, it is relying on federal cases relying on federal antitrust law, but an attempt at exclusive dealing would probably fall under section 2 of the Sherman Act dealing with attempted monopolization, rather than section 1 (contracts, combinations and conspiracies).

follows: "Every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful."

Again the Court looks to federal law to define a tying arrangement:

> A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific RR. Co. v. United States*, 356 U.S. 1 [78 S.Ct. 514, 2 L.Ed.2d 545] (1958). Such an arrangement violates section 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495 [89 S.Ct. 1252, 22 L.Ed.2d 495] (1969).

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461–62, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265, 280 (1992). Here, the tying product is grid, and the tied product is board.

CISSI has offered no direct evidence (and defendants USGI denies that any exists) that USGI required CISSI to purchase board in order to gain access to grid. The only evidence is that USGI tried to make CISSI an exclusive distributor, and when that failed, withdrew the entire USGI product line.[6]

■ A manufacturer generally has the right to unilaterally refuse to deal. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S.

752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). The refusal to deal with third parties conditioned on failure to purchase other goods or services, however, is not a unilateral refusal. *Kodak*, 504 U.S. at —— n. 8, 112 S.Ct. at 2080 n. 8, 119 L.Ed.2d at 282 n. 8. To establish an illegal tying arrangement[7] under section 2 of the Sherman Act, the Ninth Circuit requires plaintiff to demonstrate the following:

> (1) two distinct products or services are in fact tied such that the products are offered as a single package; (2) the defendant has sufficient economic power in the tying market to impose restrictions in the tied product market; (3) the amount of commerce in the tied product is not insubstantial.

*General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 977 (9th Cir.1983). Other cases have referred to additional elements, *e.g.*, *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184 (9th Cir.1984) (financial interest, coercion); *Betaseed, Inc. v. U & I Inc.*, 681 F.2d 1203, 1215 (9th Cir.1982) ("there must be some modicum of coercion shown—that is a showing of an onerous effect on an appreciable number of buyers").

■ While there is evidence that USGI has a substantial share of the tying market (plaintiff alleges more than 50 percent in different geographic markets), there is no evidence that USGI has substantial power in the tying market. Substantial power is the ability to "raise prices or to require purchasers to accept burdensome terms that could not be enacted in a completely competi-

---

6. The *Kodak* case, *supra*, was analyzed generally under section 1 (prohibition against contracts, combinations and conspiracies) and unlike this case involved a clear requirement that purchasers of Kodak duplicating machines, purchase Kodak services. Moreover, Kodak had prevented the supply of parts to non-Kodak service agencies. Thus there was an obvious tying arrangement. The issue remanded on the district court's grant of summary judgment, however, was whether or not the tying was illegal—that is, that it was not justified by business reasons.

7. Most of the cases refer to "per se" illegal tying arrangement, but not all tying arrangements are declared illegal. In her concurring opinion in *Jefferson, supra*, Justice O'Connor explained the

history of this apparent anomaly and argued for abandoning the per se label:

> Some of our earlier cases did indeed declare that tying arrangements serve "hardly any purpose beyond the suppression of competition." *Standard Oil Company v. United States*, 337 U.S. 293, 305–306 [69 S.Ct. 1051, 1058, 93 L.Ed. 1371] (1949) (dictum). However, this declaration was not taken literally even by the cases that purported to rely upon it. In practice, a tie has been illegal only if the seller is shown to have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product ..." *Northern Pacific RR. Co.*, 356 U.S. at 6, 78 S.Ct. at 518.

466 U.S. at 32, 104 S.Ct. at 1568–69.

tive market." *General Business Systems,* 699 F.2d at 977, (*citing U.S. Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 620, 97 S.Ct. 861, 867–68, 51 L.Ed.2d 80 (1977) (*Fortner* II)). Similar statements are made in *Kodak, supra,* 504 U.S. at ——, 112 S.Ct. at 2981, "the ability of single seller to raise price and restrict output". Here there is no evidence that USGI possessed such power. Rather, the evidence indicates a very competitive market. As noted above USGI's prices for grid increased at a lower rate than inflation, and customers indicate that they would switch to other products if the prices went up.

This Court concludes that the exclusive dealership offered by USGI would not have been a tying arrangement if consummated. As an alternative basis for dismissing CISSI's claim of illegal tying, the Court concludes that USGI did not have sufficient economic power in the tying market to impose its own terms. CISSI's tying claim is thus dismissed.

THEREFORE, defendant USGI's motion for partial summary judgment is GRANTED IN PART: plaintiff CISSI's antitrust claims under federal and state law are DISMISSED, and plaintiff's claim for breach of contract related to events occurring more than three years prior to filing are DISMISSED.

### ORDER ON RECONSIDERATION

On motion of plaintiff Ceiling and Interior Systems Supply, Inc., the Court reconsidered its Order of April 28, 1993, granting partial summary judgment. After full consideration of the briefs filed by counsel and the record as a whole, the Court declines to vacate its prior Order.

Plaintiff has pointed to a factual error in the April 28 Order: at page 1391, the Order refers to continuation of the distributorship with CISSI in Boise and Spokane, whereas the distributorships continued in Idaho and Montana. This factual discrepancy is not material to the Court's decision. Nor is the Court's categorization of the USGI offer as an "exclusive dealership" at pages 1394 and 1396 material to the decision. This was an offer to sell all USGI products conditioned on

discontinuance of the sale of Armstrong products. CISSI's refusal resulted in USGI withdrawing its products for sale elsewhere.

This Court is not persuaded that its prior legal conclusions were faulty, but recognizes the complexity of the issues before it. The Court is also persuaded that its grant of partial summary judgment should be entered as a final judgment pursuant to Fed.R.Civ.P. 54(b), there being no just reason for delay.

THEREFORE, the Court affirms its grant of partial summary judgment April 28, 1993, and directs the clerk to enter judgment accordingly, dismissing plaintiff's claims for breach of contract related to events occurring more than three years prior to filing suit and dismissing plaintiff's antitrust claims under federal and state law.